Wilmot, J.,
dissenting:
I cannot concur in the judgment pronounced by the court in this case. By the treaty of August 6,1846, a compensation was stipulated to be made to the Western Oherokees for wrongs alleged to have been committed upon them by the United States. This treaty was entered into by the United States, through commissioners, with three separate and recognized parties of the Oherokees, each of which had distinct and separate interests, and were represented in the execution of the treaty by separate and different delegations. The Indians parties to the treaty were the “government party,” or Eastern Oherokees, the “treaty party,” and the “Western Oherokees,” or “old settlers.” These last, under treaties of 1817 and 1819, had emigrated west of the Mississippi, and by articles of convention of May, 1828, and articles of agreement and convention of February, 1833, were in the undisputed occupation of the country set apart for the Cherokee nation. In December,' 1535, a treaty was entered into by the United States with the Eastern Oherokees for their removal to the country so set apart for them west of the Mississippi. Some time after they removed from the State of Georgia, and settled down on the territory, then in the actual occupation of the Western Oherokees, who had an established government, under a written constitution and laws, and had in all respects been treated by the United States as a separate nation. Feuds sprang up between these parties of the same family, which resulted in violence and bloodshed. The authority of the Western Oherokees was overthrown, their chief expelled, and their laws set at defiance. It was out of these troubles that 'arose the claim of the Western Oherokees upon the United States for indemnity.
In 1843 they sent a deputation to Washington to urge their claim, fully empowered to employ counsel, and to do whatever they deemed necessary to bring its justice and equity to the attention of Congress and the American people. This delegation, thus fully auihorized in a national council, employed the present claimants, and entered into a written agreement with them, by which the Kendalls bound themselves to act as counsel in presenting and urging their claim to final adjust *593 ment, tbe Indians agreeing to pay them five per cent., or the one-twentieth part, of whatever money or other thing of value should be recovered and allowed them by the United States. As the view I take of this case depends upon the effect given to this contract, I here give some of its more important provisions :
“The said delegates do hereby authorize and empower the said A. and J. E. Kendall, as agents and attorneys in faet for the said Ohero-kees west, to demand and receive from the treasury of the United States, or from the proper officer thereof, one-twentieth part of all sums of money which may be allowed and appropriated, or the one-twentieth part of any stocks, scrip, or other species of funds, securities, dr annuities which may be allowed, to he made out and issueed in their own names ; and if lands or other property, or any interest therein, shall be granted in discharge of said claims, or any part thereof, to demand and receive from the proper office or officer a full title to one-twentieth part thereof; it being the true intent and meaning of said delegates that the said A. and J. E. Kendall shall receive five per cent., or one-twentieth part, of any and everything of value which may be granted or appropriated on account of said claims, to he received directly from the United States, without any further act by or from the said Cherokees west.”
'This contract was fair and legal, and binding on the parties, equitable and just in the compensation it provided for counsel, consistent with public policy and good morals. . The Western Cherokees had neither money nor credit, and must look to their claim upon the United States as the only means they possessed through which to secure the services of counsel to enforce the justice and equity of such claim. The Kendalls ably and faithfully performed their duty as agents and attorneys. They devoted themselves with skill, ability, and laborious industry for years, to preparing and laying before the executive departments and Congress the grounds upon which the Indians relied for compensation and indemnity. They were recognized by the government officials- as the attorneys of the Western Cherokees, who were fully informed of the contract under which they acted, and of their rights under it. It is clear from the terms of the contract that the claimants did not rely upon the individual or national responsibility of the Indians, but their security was taken upon the claim itself, five per cent, of which was expressly and specifically pledged for their payment. The five per cent, or one-twentieth part of the claim recovered was thus by the contract a vested interest in the Kendalls; held, firstly, under a “power coupled with an interestand, secondly, *594 under an “assignment,” placing that amount at their absolute disposal. It was as much the property of the Kendalls as any right secured to them by contract, made under the authority of law, could be made property.
A “ 'power coupled, with an interest” is where the power and the interest are united in the same person. This subject was discussed in the case of Hunt v. Rousmanier’s Adm’s, 8 Wheaton, 175. The court in that case, after speaking of a power of attorney, revokable by the death of the party making it, go on to say: “ But if the interest or estate passes with the power, and vests in the person by whom the power is to he exercised, such person acts in his own name. The estate being in him, passes from him by a conveyance in his own name. He is no longer a substitute, acting in the place and name of another, hut a principal, acting in his own name, in pursuance of powers which limit his estate.
“When a power is coupled with an interest in the thing, which enables the holder of the power to execute it in his own name, it is not dependent on the life of the person who created it.”
“ The assignee of a chose in action, who takes it as collateral security 'for a debt, has a ‘power coupled with an interest,’ and will he protected as an assignee against the release of his assignor, made after notice of the assignment to the debtor. To constitute such an assignee of a chose in action as courts of law will protect against the acts of the assignor, the assignment need not he absolute, or of the whole subject-matter. It is enough that it carry to the assignee a ‘ poioer coupled with an interest.’ ” (Wheeler v. Wheeler, 9 Cowen, 34.)
“ An assignment of part of a judgment carries with it a corresponding interest in the land hound by a mortgage given to secure the judgment debt. The assignment of part of a judgment is pro tanto an assignment of the debt secured thereby; and also an assignment of all securities given to secure the same debt. The mortgagees, after notice of the assignment, became, both in law and equity, debtors pro tanto to the assignees.” (9 Cowen, 750, 751.)
The claim of the Cherokées was of the nature and properties of a chose in action. It was an equitable demand for compensation and indemnity — a debt which the United States was bound in justice and honor to recognize and pay. It is true that the United States was not obligated to the Indians in a legal and technical instrument, as an individual is hound by a bond or judgment. A higher obligation bound the United States to render right and justice to the Indians. She could not evade or escape her obligation to do right and equity; *595 to render full compensation and indemnity to all haying bona fide claims upon her for benefits conferred or for injuries suffered. The recognition and payment of the claim was not, therefore, in any sense a gratuity or charity bestowed upon the Indians.
It is urged that the policy of the government forbids its citizens from entering- into contracts with the Indians. Such a general policy is eminently proper in regard to ordinary contracts with individual Indians. It is .for the protection of a simple and unenlightened people against improvident and fraudulent contracts, into which they are easily drawn. But this policy has never been extended to fair and honest arrangements made with independent tribes, and which were highly beneficial to them, and calculated to protect their rights and interests. The government most certainly would not adopt a policy depriving the Indians of the means to prosecute effectually an equitable and just claim against itself for indemnity. To do so would be oppressive — a denial of right, and a refusal to allow even an appeal to itself for justice. This appeal could only be made by the employment of counsel, through whom the claim of the Indians could be presented and enforced. To disregard such a contract, and by its legislation defeat the payment of money earned under it, would be the denial to the Indians of the right to prosecute their claim. But such is not and never lias been the policy of this government. At the time of the making of this contract, by which the one-twentieth part of the amount ultimately recovered became vested in the claimants, the government favored such contracts, when honestly and fairly made, and, in so far as it could, afforded protection to the rights of our citizens under them.
At page 1066 of Attorneys General’s Opinions, there is an opinion of B. F. Butler to the effect that a power of attorney to secure an agent’s commission cannot be revoked.
But the principle is much more explicitly laid down by Attorney General Gilpin, in March, 1840, (Churchill's case, pages 1303 — 4:)
“Tour first inquiry is, whether the provisions of the 9th and 17th articles (which direct that the just debts of the Indians shall.be paid out of any moneys due them for their improvements and claims, and that all claims arising under or provided for by the treaty shall be examined and adjudicated by certain commissioners, whose decisions shall be final) apply to the case of a person to wliom no debt was owing at the date of the treaty, but who has acted as an attorney for the Indian, for the recovery of his claim, and has had the sum in question adjudicated to him as a proper compensation for so acting. In reply to this inquiry, I have the honor to say, that I do not consider this to *596 be one of the debts intended to be provided for by the 9th article of' the treaty. I am of opinion, however, that if the person presenting the claim was a duly constituted attorney of the Indian, with authority to prosecute and recover the claim, and the department is satisfied that the contract between him and his principal is free from fraud, and is a just compensation for services rendered, in such case he has an interest in the fund which the department ought to recognize; and it should not, by paying over the whole amount to the Indian, subject him to probable danger of loss, and the certainty of much expense and delay.”
‘‘Tour second inquiry is, whether the whole scope of the treaty does not warrant a payment to the Indians, in person, of such sums as may be due to them under it; or whether they must be paid to the persons who present powers of attorney from them.
“ In reply to this inquiry I have the honor to state that the treaty clearly recognizes payments directly to the Indians, and the department will be fully warranted in so making them. I beg, however, to observe that I consider the remarks I have made in reply to your first inquiry as equally applicable to these cases; for, certainly, where an attorney has performed an important service, collected the evidence, and been instrumental in securing a claim which might otherwise have been lost; and where this has been done under the stipulation, or with a bona fide understanding that he was to receive the amount to which he was entitled directly from the United States, he has an interest in the fund which the principal himself could not revoke, and which the department is bound to recognize.”
The contract made by the Kendalls with the Western Cherokees was in all respects a legal and valid contract in law — it would have been sustained and enforced by any court having jurisdiction over the subject-matter — and was one which the policy of every just government should sanction and approve. It was based upon a good consideration — services rendered to the Indians. The services were such as they needed and stipulated for, and were ably and faithfully rendered. The compensation agreed upon was contingent upon success, and was indeed low for the services performed. It is well settled at common law that an attorney has a lien upon the judgment of his client, and here the lien was secured by an assignment and by a power •' coupled with an interest” which courts were bound to protect against all having notice of the assignment.
There was secured by the treaty to the Western Cherokees, and finally appropriated and paid to them under it, the sum of $887,480 15; five per cent, upon which, less $1,000 previously paid and indorsed on *597 the contract, is the amount now sought to be recovered of .the United States. It is contended that the right of the Kendalls upon this fund was taken away, because, upon the ratification of the treaty by the Senate, the sum of fifty thousand dollars, set apart therein “ to be paid the delegation of that portion of the Cherokee people who are parties to the treaty, to defray the expenses of prosecuting their claims against the government of the United States, including the late Captain John Rogers,” wasstruck out; and by the treaty, therefore, no provision was made for expenses incurred in the prosecution of their claim; and because the treaty provided that the money allowed the Western Cherokees should be “ distributed per capita to each individual,” and should not be assignable, but be “ paid directly to the person entitled to it, or to his legal representatives and because, further, it was in the treaty provided “that the per capita allowance to be given to the Western Cherokees, or Old Settlers, should be held 'in trust by the government of the United States, aud paid out to each individual belonging to that party, or head of family, or his legal'representatives.”
The interest of the Kendalls in this fund was certain and ascertained — it was a vested interest; they held the one-twentieth part by the same title and right that the Western Cherokees held the balance. It is very clear that the Indians could not, by any act of theirs, divest the Kendalls of the interest they had in this fund; and to my mind it is equally clear that the United States could not do so after notice of the Kendalls’ interest, either by making it a trust fund, and specifying the objects of the trust, or in any other way. I repeat, this fund was not a charity or gratuity which the donor could dispose of as he pleased ; it was an indemnity and just compensation made to the Western Cherokees by the United States, and neither the debtor nor creditor could dispose of it in a way to defeat an interest actually vested in law in a third person, such interest being obtained honestly, upon a good consideration, and without fraud. I am aware of the long-settled and humane policy of the government in its intercourse and dealings with the Indian tribes. It regards them as wards under its guardianship and care. The office of a guardian is that of protection to the interest of its ward; not to aid the ward in the perpetration of a wrong or fraud. It is not just to treat with the Indians as independent nationalities, and refuse to recognize their right to protect their interest by reasonable and bona fide arrangements, necessary to secure to them their national rights. But what is the legal interpretation to be put upon this treaty, touching the interest of the Kendalls in the fund created by it ? The treaty, as it stood before its ratifica *598 tion by tlie Senate, set apart the sum of fifty thousand dollars, "to be paid to the delegation,” &c., “to defray the expenses of prosecuting their claim, including the late Captain John Rogers.” This was struck out, and the Western Oherokees agreed to the treaty as amended by the Senate. It was a sum "to be paid to the delegation,” to meet certain expenses for the prosecution of their claim, including the late. Captain John-Rogers, that the Senate struck out, and to which the Indians agreed. The Senate was unwilling to place this $50,000 in the hands of the “ delegation,” making them trustees for its payment in satisfaction of certain claims; or they were adverse to the payment of anything to Captain Rogers and others having claims upon the Indians. The money of the Kendalls was certainly not included in any funds which the treaty put in the hands of the “ delegation.” By the terms of their contract and the settled law of the case, their interest could never go into other hands than their own. They had no claim upon the “ delegation” — they owned a part of the fund itself. The provisions of the treaty requiring a per capita distribution among the Indians most, by every legal construction, be held as applying only to that part of the fund in which they were interested. Those provisions could not properly be understood as embracing the one-twentieth part, in which the Indians had no interest, and which they had assigned in payment of their counsel. That such was the desire and intention of the Indians is shown by their indorsement on the contract, under date of August 14, the treaty having been ratified on the 8th of that month. Such, at all events, it is believed, is the construction a court of law is bound to put upon the treaty as confirmed and finally agreed upon by the parties. The indorsement is as follows :
“ August 14, 1846.
“ The undersigned, delegates of the Western Oherokees, or Old Settlers, being a party to a treaty recently concluded to put an end to the Cherokee difficulties, do hereby authorize and request the Secretary of War to pay the commissions stipulated for in the within contract, out of any moneys which may be appropriated to pay the debts of the Old Settlers, or out of any money which may be found due them under the said treaty, it being our intention that this contract shall be executed in good faith ”
By act of the 30th of September, 1850, an appropriation was made to fulfil this treaty, and therein it was provided, “ That in no case shall any money hereby appropriated be paid to any agent of said Indians, or to any other person or persons than the Indian or Indians to *599 whom the same is due.” This provision left no course but to pay the money in strict compliance with the appropriation. Accordingly the whole sum appropriated was paid to the Indians, under a per capita distribution, and the Kendalls were defeated of their interest in the treaty fund. -In my view, Congress might with as much propriety have taken any other $43,370 money of the Kendalls, and appropriated it to a distribution among the Indians. The Kendalls are without redress, except against the United States. The treaty merged all the different parties of the Oherokees in one common nation, and under one government, and thus destroyed the separate political existence of the Western Oherokees. Against whom, then, did the debt survive? Not against the whole nation, for the union was political, and had no reference to the separate debts of the factions; not against the individual Oherokees — they were not parties to the contract, and therefore not indebted under it. It survived against the United States, which laid its hands upon the money and property of the Kendalls, and applied it under a treaty stipulation with the Oherokees. There is both a legal and equitable obligation imposed upon the United States to pay to the claimants the money so taken aud applied. I am of opinion that the claimants should recover the sum of forty-three thousand three hundred and seventy dollars.